UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

COMMONWEALTH OF KENTUCKY, ENVIRONMENTAL
AND PUBLIC PROTECTION CABINET                                    PLAINTIFF

and

UNITED STATES OF AMERICA                          PLAINTIFF-INTERVENER

v.                                          CIVIL ACTION NO. 3:05CV-236-S

LOUISVILLE AND JEFFERSON COUNTY
METROPOLITAN SEWER DISTRICT                                    DEFENDANT

## MEMORANDUM OPINION

This matter is before the court on motion of the defendant, Louisville and Jefferson County Metropolitan Sewer District ("MSD"), for judicial resolution of a dispute purportedly arising under the Consent Agreement entered in this case (DN 24). For the reasons set forth herein, the motion will be denied.

In April, 2005, the Kentucky Environmental and Public Protection Cabinet filed a complaint against MSD for penalties and injunctive relief under the Clean Water Act ("CWA"), 33 U.S.C. § 1319, KRS 224.99-010, and 224.70-110 alleging that MSD discharged pollutants in violation of CWA and various National Pollutant Discharge Elimination System ("NPDES") permits issued to MSD by the Kentucky Department of Environmental Protection ("KDEP"). Shortly thereafter, the United States intervened on behalf of the United States Environmental Protection Agency ("EPA"). The parties agreed to terms of a Consent Decree ("the decree"), and sought its entry in July, 2005. Clarence Hixson and Friends of Beargrass Creek were granted leave to intervene in the action for purposes of commenting on the proposed Consent Decree. After considering the comments and the memoranda of the parties, the court entered the decree on August 12, 2005.

Paragraph 43 of the decree states:

This Consent Decree and any Amended Consent Decree is designed to resolve the civil claims for penalties of the Cabinet and EPA for violations of KRS Chapter 224 and the [Clean Water] Act as alleged in the complaints filed by the Cabinet and EPA up through the date of entry of this Consent Decree.  The Cabinet and EPA have relied upon the factual representations of MSD.  Nothing contained herein shall be construed to waive or to limit any remedy or cause of action by the Cabinet and EPA based on statutes or regulations under applicable jurisdiction and MSD reserves its defenses thereto, except that MSD shall not use this Consent Decree as a defense. The Cabinet and EPA expressly reserve their rights at any time to issue administrative orders and to take any other action deemed necessary, including the right to order all necessary remedial measures, assess penalties for violations, or recover all response costs incurred, and MSD reserves its defenses thereto, except that MSD shall not use this Consent Decree or any Amended Consent Decree as a defense.

EPA[1] has submitted the affidavit of John Harkins, the EPA regional enforcement officer assigned to the CWA enforcement action against MSD.  He states that he helped prepare and review:

1.  An informal information request sent to MSD on October 12, 2006.

2.  A Section 308 information request sent to MSD on December 20, 2006.

3.  A Section 308 information request sent to MSD on March 14, 2007.

Harkins Aff., ¶¶ 3, 4.

MSD responded to the October 12th and December 20th requests.  MSD filed the present motion in lieu of answering the March 14th request.  MSD has moved for judicial resolution of what it contends is a dispute arising under the decree.  It urges that the 308 requests unilaterally modify the terms of the decree, are duplicative of reporting already required, and disrupt MSD's attempts to meet various compliance deadlines set out in the decree.  EPA disagrees, stating that its requests were not issued pursuant to the decree, but rather in spite of it, due to their need to compile additional data concerning events at a number of MSD Waste Water Treatment Facilities ("WWTFs") and,  particularly, at the Jeffersontown WWTF.

---

[1] Although the Commonwealth of Kentucky, Environmental and Public Protection Cabinet was also a plaintiff in this action, the EPA has taken the lead in addressing this motion and has filed the only responsive brief.

MSD seeks to have this court address its concerns by attempting to invoke the dispute resolution provision of the decree and requesting this court to conduct a hearing.  ¶¶ 57-58 of the decree states, in pertinent part:

> Any dispute that arises under or with respect to this Consent Decree shall in the first instance be the subject of informal negotiations between the Parties.  MSD shall invoke the informal dispute resolution procedures by notifying all other Parties in writing of the matter(s) in dispute and of MSD's intention to resolve the dispute under these paragraphs 57 and 58...If informal negotiations are unsuccessful, the position of the Cabinet and EPA shall control unless, within thirty (30) days after the conclusion of the informal negotiation period, MSD seeks judicial review of the dispute by filing with the Court and serving on the Cabinet and EPA a motion requesting judicial resolution of the dispute...Either party may request an evidentiary hearing for good cause.  The burden of proof is on MSD to demonstrate that its position on the matter in dispute meets the objectives of the Consent Decree, and Amended Consent Decree, the Act and KRS Chapter 224...

It is EPA's contention, however, that its 308 requests were made under the authority granted to it by Section 308 of the CWA, 33 U.S.C. § 1318 which states:

> Whenever required to carry out the objective of this chapter, including but not limited to (1) developing or assisting in the development of any effluent limitation, or other limitation, prohibition, or effluent standard, pretreatment standard, or standard of performance under this chapter; [or] (2) determining whether any person is in violation of any such effluent limitation, or other limitation, prohibition or effluent standard, pretreatment standard of performance;...(A) the Administrator shall require the owner or operator of any point source to: (i) establish and maintain such records, (ii) make such reports, (iii) install, use and maintain such monitoring equipment or methods...(iv) sample such effluents (in accordance with such methods, at such locations, at such intervals, and in such a manner as the Administrator shall prescribe), and (v) provide such other information as he may reasonably require.

EPA urges that ¶ 43 of the decree makes clear that nothing in the decree ties the hands of the EPA with respect to requests for information from MSD under the authority of § 308.  It contends that this latitude is reserved to it so as to permit monitoring of MSD's activities for compliance with its obligations under the decree and to enable it to determine whether any post-decree violations occur. Indeed, MSD agreed in the decree that it would not utilize the decree as a shield from further agency action.  *See*, ¶ 43 ("The Cabinet and EPA have relied upon the factual representations of MSD. Nothing contained herein shall be construed to waive or to limit any remedy or cause of action by

- 3 -

the Cabinet and EPA based on statutes or regulations under applicable jurisdiction and MSD reserves its defenses, *except that MSD shall not use this Consent Decree...as a defense*.")(emphasis added). As noted by EPA, the decree resolved only the then-pending civil claims for penalties through the date of the decree.

MSD argues that the decree requires, in part, that MSD evaluate and improve performance at the Jeffersontown WWTF in accordance with a long-range timetable, and that corresponding reporting requirements in connection with that evaluation and improvement process were established. Therefore, MSD urges that additional monitoring and reporting required by the outstanding 308 request duplicates or otherwise unilaterally changes the requirements put in place by the decree. In support of this position, MSD cites to pages 48-49 of EPA's motion for entry of the decree where EPA stated:

> The proposed Consent Decree does in fact require MSD to perform an evaluation of JWWTP [a/k/a Jeffersontown WWTF] peak flow treatment capacity before the final SSDP [Sanitary Sewer Discharge Plan] is completed, consistent with EPA requirements for such an evaluation. Paragraph 24.a.(3). The proposed Consent Decree sets out in detail the elements of the final SSDP. Plaintiffs will review and approve or disapprove and provide comments on deficiencies in the final SSDP, and will take into consideration how MSD proposes to improve performance at the JWWTP. This evaluation shall resolve any issue regarding peak flow treatment capacity at the JWWTP, and will be completed and submitted before December 31, 2008.

MSD contends that the above-quoted portion of EPA's motion evidences that the decree contains the sum total of its obligations with regard to peak flow treatment at the Jeffersontown WWTF.

MSD fails to quote the remainder of that subsection of EPA's brief, however, which states:

> Further, the JWWTP, as is true for all MSD WWTPs, must continue to meet its permit requirements now and in the future. The proposed Consent Decree does not address or resolve permit requirements or any other regulatory requirements at the JWWTP or at any other MSD WWTP. The proposed Consent Decree only adds to these requirements by stating that MSD must complete the peak flow treatment capacity evaluation before submitting its final SSDP...No permit or regulatory requirements applicable to JWWTP are being resolved, waived or otherwise compromised under the proposed Consent Decree.

- 4 -

MSD has not shown that the decree imposes limitations on EPA's functions and powers under the CWA, nor that the decree relieves MSD of its obligations to comply with Kentucky permit requirements or other requirements imposed by EPA.

Harkins stated in his affidavit that the first, third and fourth requirements of the March 14, 2007 information request require that MSD provide EPA with data which MSD's permits already require it to gather. He then describes each requirement of the outstanding 308 request.

With respect to what the parties refer to as peak flow data, Harkins stated that EPA requested data for the sixteen WWTFs for which MSD had indicated such daily data was taken and stored. In its earlier responses, MSD had provided some of this data. Harkins stated that EPA then sought complete data via the March request, or an explanation why the data was unavailable. Therefore, EPA apparently does not seek anything more in this particular provision than disclosure to EPA of data already said to be maintained by MSD.

MSD has directed to provide EPA monthly updates concerning any bypasses which occur after January 17, 2007, and include with them the date of any such occurrence, beginning and ending times, volume, and copies of all reports sent to Kentucky. Harkins stated that this request for information and for continued monitoring of the events was necessitated by MSD earlier responses in which it had identified some but not all of the occurrences. Harkins noted that MSD's permits already require reporting of bypasses to Kentucky including, date, time, quantity and possible environmental impact.

MSD has been directed to provide EPA the same monthly updates and conduct the same monitoring of occurrences for its other WWTFs as required for the Jeffersontown WWTF. Again, Harkins noted that MSD is already required to gather such information and provide it to Kentucky under its permits.

MSD was asked to clarify when a certain flow monitoring device had been installed at the Jeffersontown WWTF. The clarification was requested to explain a discrepancy in MSD's earlier disclosures.

Finally, MSD has been directed to inspect constructed overflows during rain events and maintain records of those inspections. MSD had stated in an earlier response that it monitored the constructed overflow but that records of these inspections for the Jeffersontown facility were not kept. Harkins stated that a record of when and under what circumstances the constructed sewer overflow discharges is necessary to an understanding of the impact of the discharges and what remedial relief is necessary for the Jeffersontown WWTF.

In sum, while MSD contends that the requirements of the 308 request are onerous and disruptive, Harkin explained that any monitoring required in the request was constrained so as to coincide with permit requirements and MSD procedures already in place. While MSD objects to further reporting, EPA urges that the information it seeks is information which MSD is obligated to gather and maintain. MSD's contention that it is complying with all reporting requirements under the decree begs the question of whether EPA can make the present requests. Contrary to MSD's contention, we do not agree that this thus generates a dispute arising under or with respect to the consent decree, especially in light of the clear language that MSD is precluded from using the decree as a defense. We conclude, therefore, that MSD has not shown that it is entitled to emply the dispute resolution provision of the decree.

Finally, MSD has come forward with no authority in contradistinction to the holding in *Southern Ohio Coal Co. v. Office of Surface Mining, reclamation and Enforcement*, 20 F.3d 1418 (6th Cir. 1994), and cases cited therein, that the district courts lack jurisdiction to review compliance orders prior to the commencement of enforcement proceedings by the EPA. *Id.*, 1425-26.[2] MSD

---

[2]The cases cited by MSD are inapposite as none of them involved challenges to 308 requests issued pursuant to CWA.

would distinguish the present case from *Southern Ohio Coal Co.* on the ground that EPA's 308 requests were issued after the entry of the consent decree.  We reject that distinction in this case, however, as the consent decree itself reserved to EPA the very power it exercised under § 308 in issuing the requests.

For these reasons, the motion of MSD for judicial resolution (DN 24) will be denied by separate order.

**IT IS SO ORDERED.**